Stanley LEVICOFF, Plaintiff,

v.

GENERAL MOTORS CORPORATION, General Motors Acceptance Corporation and McKean Oldsmobile Company, Defendants.

Civ. A. No. 82–0747.

United States District Court,
W.D. Pennsylvania.

Nov. 16, 1982.

Avrum Levicoff, Egler & Reinstadtler, Pittsburgh, Pa., for plaintiff.

Carl A. Eck, Meyer, Darragh, Buckler, Bebenek & Eck, Pittsburgh, Pa., for General Motors Corp. and General Motors Acceptance Corp., defendants.

Barry M. Simpson, Pittsburgh, Pa., for McKean Oldsmobile Co.

1. GM and GMAC are jointly represented by counsel. One Motion to Dismiss has been filed on behalf of both. McKean Oldsmobile is represented by other counsel and a separate Motion to Dismiss has been filed on its behalf. The Court has been informed, however, that McKean adopts the position and arguments of GM and GMAC as set forth in their brief and at oral argument.

## OPINION

MANSMANN, District Judge.

This matter is before the Court on Motions to Dismiss filed by Defendants General Motors Corporation ("GM"), General Motors Acceptance Corporation ("GMAC") and McKean Oldsmobile Company ("McKean" or "McKean Oldsmobile").[1] Plaintiff, Stanley Levicoff, brought this action as a result of his purchase of a new GM automobile which was financed by GMAC. For the reasons set forth below, Defendants' Motions to Dismiss are granted.[2]

\* \* \* \* \* \*

## FACTUAL BACKGROUND

The facts of this case, accepting the averments of the Complaint as stating the facts,[3] may be summarized as follows:

A substantial portion of the sales of new GM automobiles involve the financing of a part of the total purchase price by a bank or other financial institution. GMAC, a wholly-owned subsidiary of GM, provides, *inter alia,* retail financing for the purchase of GM automobiles from authorized franchise dealers. In 1981, as part of GM's marketing activities relative to the introduction of the 1982 models, GMAC offered financing at an annual interest rate of 12.8% for certain of the new GM models as well as for all of the remaining 1981 GM automobiles. This credit rate was lower than the prevailing rate then offered by other lending institutions for retail automobile financing.

Plaintiff periodically purchases a new automobile in order to carry on his business in Pennsylvania and Ohio as a manufacturer's representative. Plaintiff entered into an agreement with McKean Oldsmobile, an authorized franchise dealer for GM automobiles, for the purchase of a 1982 Oldsmobile

2. Also pending before this Court is a Motion for Class Certification filed by Plaintiff. Because of our decision on the Motions to Dismiss, it is unnecessary to rule on the Motion for Class Certification.

3. *Mortensen v. First Fed. Sav. and Loan Ass'n,* 549 F.2d 884, 891 (3d Cir.1977).

Cutlass.[4] Plaintiff requested that GMAC finance the purchase at the rate of 12.8%.[5] GMAC, however, refused to finance the purchase at that rate since the 1982 Cutlass was not one of the models for which the 12.8% rate was available. Rather, GMAC would only offer a rate of 16.8% on the new Oldsmobile Cutlass. Nevertheless, Plaintiff purchased the Cutlass and obtained the financing from GMAC at the higher rate.

Plaintiff filed the present action on April 26, 1982, alleging that Defendants have violated § 1 of the Sherman Act, 15 U.S.C. § 1.[6] The first count of the Complaint alleges that the Defendants have engaged in a *per se* violation of § 1 of the Sherman Act by forming an illegal tying arrangement. The second count of the Complaint alleges that GM and GMAC have violated § 1 by conspiring to unreasonably restrain trade. The third count alleges that all Defendants have engaged in a *per se* violation of § 1 by entering into an unlawful price-fixing agreement.

Defendants have moved to dismiss the Complaint under Fed.R.Civ.P. 12(b)(6), contending that all three counts fail to state a claim for relief. This Court will consider the challenges to each count separately and will resolve them accordingly.

\* \* \* \* \* \*

## I.

Defendants contend that Plaintiff has failed to state an illegal tying arrangement because in this case, the financial terms and the automobile constitute one product rather than the two separate products required for a tying arrangement.

Plaintiff alleges that Defendants tied the availability of consumer financing at the rate of 12.8% to the purchase of only certain

designated GM automobiles. According to Plaintiff, the financing or the alleged "tying" product, and the automobile, the alleged "tied" product, constitute two separate items.

The terms of § 1 of the Sherman Act prohibit all agreements in restraint of trade. That statutory provision, however, has been interpreted to preclude only those agreements or conspiracies which "unreasonably" restrain trade. *Standard Oil Co. of New Jersey v. United States,* 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911); *Chicago Bd. of Trade v. United States,* 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed. 683 (1918).

There are some agreements or practices which are conclusively presumed to be "unreasonable," and therefore illegal, because of their inherent deleterious effect on competition and their lack of redeeming value. Because such practices are considered illegal *per se,* it is unnecessary to inquire into their reasonableness in a particular case. *Northern Pac. Ry. v. United States,* 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). It is well established that tying arrangements are among those restraints which are illegal *per se. Fortner Enterprises, Inc. v. United States Steel Corp.,* 394 U.S. 495, 498, 89 S.Ct. 1252, 1256, 22 L.Ed.2d 495 (1969) (*"Fortner I"*); *Northern Pac. Ry. v. United States, supra.*

To prove an illegal tying arrangement, a Plaintiff must establish three elements: First, he must establish the existence of a tie; that is, "an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that prod-

4. The purchase contract between Plaintiff and McKean was made contingent upon the agreement of GMAC to finance the purchase.

5. Plaintiff alleges that McKean advised him that financing was available from GMAC at the 12.8% rate. Plaintiff also alleges that GM and McKean advertised the availability of 12.8% financing for new GM automobiles without stating that this financing was available only for certain selected models. These allegations, while possibly pertinent to other types of

claims, are not relevant to the antitrust action before us.

6. Section one of the Sherman Act provides in pertinent part:

Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal. 15 U.S.C. § 1.

uct from any other supplier." *Northern Pac. Ry. v. United States, supra* at 5–6, 78 S.Ct. at 518–519; *Ungar v. Dunkin Donuts of America, Inc.,* 531 F.2d 1211, 1224 (3d Cir.1976), *cert. denied,* 429 U.S. 823, 97 S.Ct. 74, 50 L.Ed.2d 84 (1976). Second, the Plaintiff must establish that the seller has "sufficient economic power with respect to the tying product to appreciably restrain free competition in the market for the tied product." *Id.* Third, the Plaintiff must show that "a 'not insubstantial' amount of interstate commerce is affected." *Id.*

We believe in this case that Plaintiff has failed to allege the existence of a tie. In this regard, we disagree with Plaintiff's characterization of the 12.8% financing as the "tying" product.

■ Plaintiff went to McKean Oldsmobile to purchase an automobile. Clearly, he did not go to McKean to purchase financing since McKean is not in the business of selling financing. Rather, McKean sells automobiles and Plaintiff, a person who periodically purchases new automobiles for his work, went to the automobile dealer for that very purpose. The desired item or "tying" product is therefore the automobile.[7]

■ Plaintiff, however, does not offer any product tied to the purchase of the desired automobile nor does the record suggest any. Thus, Plaintiff was not required to purchase another product in order to obtain the automobile. For example, McKean Oldsmobile did not condition the sale of the desired automobile on Plaintiff's agreement to purchase all future replacement parts only from McKean. *See generally United States v. Mercedes-Benz of No. America,* 517 F.Supp. 1369 (N.D.Cal.1981). Further, none of the Defendants required the Plaintiff to obtain his financing from GMAC, to the exclusion of other financial institutions, in order to acquire the automobile. Plaintiff was free to apply for financing from any source or from no source.[8]

Plaintiff relies heavily upon *Fortner I, supra,* to support his contention that the facts establish a tie-in. *Fortner I,* however, is distinguishable from the instant case.

In *Fortner I,* the Plaintiff, Fortner Enterprises, Inc., obtained loans from Credit Corp., a subsidiary of United States Steel Corp., for the purpose of acquiring and developing land. Credit Corp. agreed to extend the loans for the land but only on the condition that the Plaintiff also purchase prefabricated homes from a division of its parent corporation. This situation clearly is not present in the instant case.

Plaintiff did not go to McKean for the purpose of obtaining loans. Even assuming *arguendo* that Plaintiff did go to McKean for that purpose, Plaintiff was not required to purchase an additional item, or to purchase only items from a selected supplier in order to obtain the loan for the automobile. For example, Plaintiff was not required to purchase a GM truck as a condition of obtaining a loan for the purchase of a GM automobile. The availability of different financing rates for different automobiles does not alter this analysis.

Plaintiff was free to obtain a loan from GMAC, at the rate of 16.8%, in order to purchase his 1982 Oldsmobile Cutlass. Plaintiff was also free to obtain a loan from GMAC, at the rate of 12.8%, in order to purchase certain other GM automobiles.[9] Neither of these loans were conditioned upon the additional purchase of another product over and above the item for which the loan was required.

---

**7.** For purposes of this Opinion, we will assume that the specific item Plaintiff wished to purchase was a 1982 Oldsmobile Cutlass.

**8.** In this regard, there is nothing to suggest that Plaintiff was required by Defendants to obtain financing for the purchase as opposed to paying in full for the automobile himself at the time of purchase.

**9.** There is nothing in the law which requires GMAC to charge the same interest rate on all models of GM automobiles which it agrees to finance. Furthermore, Plaintiff was free to "shop around" for a better interest rate from other financial institutions.

Thus, it cannot be said that a tying arrangement exists based upon the facts presented by Plaintiff.

\* \* \* \* \* \*

## II.

Defendants GM and GMAC maintain that their marketing program under which a more favorable financing rate was available on certain GM automobiles, does not constitute a restraint of trade in violation of § 1 of the Sherman Act.

Plaintiff alleges that the program is an unreasonable restraint of trade because the alleged conspiracy between GM and GMAC effectively precludes GMAC from competing in the market for the retail financing of new automobiles.

■ In order to sustain a cause of action under § 1 of the Sherman Act, using the "rule of reason" analysis, Plaintiff must plead and prove:

(1) that the defendants contracted, combined, or conspired among each other; (2) that the combination or conspiracy produced adverse, anti-competitive effects within relevant product and geographic markets; (3) that the objects of and the conduct pursuant to that contract or conspiracy were illegal; and (4) that the plaintiff was injured as a proximate result of that conspiracy.

*Martin B. Glauser Dodge Co. v. Chrysler Corp.,* 570 F.2d 72, 81 (3d Cir.1977), *cert. denied,* 436 U.S. 913, 98 S.Ct. 2253, 56 L.Ed.2d 413 (1978).

■ In the instant case, it is self-evident that the objective of the Defendants' marketing program was to stimulate the sale of certain automobiles, namely, those for which the 12.8% financing rate was available. Indeed, Plaintiff expressly states in his Complaint that Defendants' objective

was to stimulate the sale of those automobiles. This objective can hardly be considered illegal. If such an objective was deemed illegal, all manufacturers, retailers, suppliers and dealers would be guilty of violating the antitrust laws since all, at some point, attempt to stimulate the sales of certain of their products, presumably those products which are not selling as well as others. This goal is a legitimate business objective rather than one proscribed by the antitrust laws.[10]

■ We also find that Plaintiff's allegation concerning GMAC's inability to compete in the market for the retail financing of new automobiles to be without merit. The decision to finance certain new cars at one interest rate and other new cars at another interest rate is within the business prerogatives of GM and GMAC.

Moreover, we remind Plaintiff that GMAC is not a competitor of GM. Plaintiff's contention that GMAC is effectively precluded from competing as a result of the alleged conspiracy would have greater significance, if it has any significance at all, if GMAC was a competitor of GM, or a competitor of one of GM's subsidiaries, whom GM was attempting to eliminate from competition.[11]

\* \* \* \* \* \*

## III.

Defendants contend that the Complaint does not state an illegal price-fixing arrangement because it fails to allege that GM in any way restricted McKean's freedom concerning the price at which the dealer sold automobiles.

Plaintiff alleges that all of the Defendants conspired to fix the price of loans for the purchase of new automobiles.

**10.** Defendants' marketing program, if anything, enhances competition. Enhancement of competition is the object of the antitrust laws. *Martin B. Glauser Dodge Co. v. Chrysler Corp., supra,* at 86. Other manufacturers, in response, may lower the prices of some or all of their automobiles or they may offer other benefits such as favorable payment terms or extended warranty periods.

**11.** We also question Plaintiff's characterization of GMAC as a competitor of other financial institutions since GMAC's major function, if not its only function, is to promote the sale of GM products through, *inter alia,* the financing of the purchases of GM products.

■ Price-fixing arrangements are among those restraints which are illegal *per se*. *Northern Pac. Ry. v. United States, supra* at 5, 78 S.Ct. at 518. Such schemes may exist as horizontal agreements among competitors. *See Catalano, Inc. v. Target Sales, Inc.,* 446 U.S. 643, 100 S.Ct. 1925, 64 L.Ed.2d 580 (1980). They may also take the form of vertical restraints involving a seller or manufacturer operating at more than one level of distribution. *See Albrecht v. Herald Co.,* 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968). Vertical price-fixing, generally known as "resale price maintenance," exists if a manufacturer or wholesaler suggests resale prices to his retailer and then secures compliance with those prices by doing more than announcing his price policy and refusing to deal. *Id.* at 149, 88 S.Ct. at 871.

■ The instant case clearly does not involve horizontal price-fixing because the Defendants are not competitors vis à vis each other.

■ In addition, we find that the Complaint fails to allege a vertical price-fixing agreement. In this regard, Plaintiff does not allege any facts showing that GM took steps to forcibly impose any particular prices or price levels on McKean Oldsmobile. There is no suggestion in the pleadings that McKean was prevented from making "deals" with customers on an individual basis or otherwise precluded from charging prices different from the manufacturer's suggested retail price.

While the interest rate charged for the financing of a purchase might alter the amount eventually paid by the customer, that amount is under the control of the customer more than that of any of the Defendants. Thus, it is the customer who decides whether and where to seek a loan for the purchase of a new car.

12. Plaintiff has pleaded no facts indicating McKean's involvement with the setting of GMAC's interest rates. "A general allegation of conspiracy, such as made in this Complaint, without a statement of the facts constituting the conspiracy, is a mere allegation of a legal conclusion and is inadequate of itself to state a

■ Further, the fact that GMAC charges a certain interest rate on a certain automobile does not "fix" the price of that automobile. McKean Oldsmobile is still free to alter that price as it sees fit.

Plaintiff's assertion of a price-fixing agreement as regards automobile loans is without merit. There is no reason why GM and GMAC cannot agree with each other as to the rate of interest to be charged on specified automobiles.[12] Thus, GMAC is not in the chain of distribution for GM automobiles, or other GM products, nor is GMAC a competitor of GM. Therefore, the Complaint does not allege either a vertical or horizontal price-fixing arrangement.

Accordingly, Defendants' Motions to Dismiss must be granted.

cause of action." *Larry R. George Sales Co. v. Cool Attic Corp.,* 587 F.2d 266, 273 (5th Cir. 1979). We note, without conclusively deciding this issue, that it is unlikely that McKean Oldsmobile is involved with the setting of GMAC's interest rates.