**Francis J. WALDO, Plaintiff,**

v.

**NORTH AMERICAN VAN LINES, INC., Defendant.**

**Civ. A. No. 82–2668.**

United States District Court, W.D. Pennsylvania.

July 12, 1984.

John T. Tierney III, Tarasi & Tighe P.C., Pittsburgh, Pa., John W. Pollins III, Greensburg, Pa., for plaintiff.

David J. Armstrong, M. Richard Dunlap, Dickie, McCamey & Chilcote, Pittsburgh, Pa., for defendant.

## OPINION

COHILL, District Judge.

### Introduction

This matter is presently before the Court on Plaintiff's Motion for Class Certification. Plaintiff, Francis Waldo, a former truck driver, brought this action against his former employer, North American Van Lines, for alleged violations of section 1 of the Sherman Act, 15 U.S.C. § 1, section 3 of the Clayton Act, 15 U.S.C. § 14, section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq., and the Pennsylvania Unfair Trade Practices Act and Consumer Protection Law, 73 Pa.C.S.A. § 201–1 et seq. The Complaint was filed on December 13, 1982. Discovery on the class certification issue was conducted for approximately one year before we heard argument in February, 1984.

### The Complaint

The Complaint in this action alleges that North American, as part of a conspiracy, 1) coerced truck drivers ("owner/operators") into purchasing all of their insurance through North American as a condition of purchasing their motor vehicles; 2) required owner/operators, as a condition of purchasing their motor vehicles, to enter into exclusive dealing arrangements with North American; and 3) refused to allow owner/operators to "trip lease," or contract with other carriers, thus boycotting the drivers in their businesses. (Complaint, ¶¶ 14–17; Plaintiff's Brief in Support of Motion for Class Certification, at 17–18). We consider the second and third issues to be related. See Plaintiff's Brief, at 25, "[the provision] for trip leasing existed on paper only and did not represent an alternative for drivers to avoid the effects of the tie-in arrangement that they were to drive exclusively for North American."

Plaintiff seeks treble damages, a declaration that the insurance provisions of the agreements entered into between Plaintiff and Defendant are unlawful, and an injunction barring similar insurance and operating agreements in the future.

In order to determine the propriety of class certification, it is necessary first to review the background of plaintiff's complaint and the nature of his claims. *Katz v. Carte Blanche Corp.*, 496 F.2d 747, 756–57 (3d Cir.), *cert. denied*, 419 U.S. 885, 95 S.Ct. 152, 42 L.Ed.2d 125 (1974).

### Background

Plaintiff, Francis Waldo, is a former owner/operator of a tractor trailer in a fleet operated by defendant, North American Van Lines, Inc. North American Van Lines is a motor common carrier operating under authority granted by the Interstate Commerce Commission and transports freight for hire on a nationwide basis. Owner/operators are independent contractors; a driver must own a truck to drive in the North American fleet. If a prospective driver does not own a truck, he or she may purchase one from North American. The truck trailer is leased back to North American for its exclusive use, and North American provides, in return, the trailers for transporting freight.

In 1978, Francis Waldo responded to a newspaper advertisement listing employment opportunities in trucking as an "owner/operator" with North American. After investigating several sources from which to buy a truck, Plaintiff decided to participate in North American's lease/purchase plan. He attended a one-week training program at Fort Wayne, Indiana. During the training program, two agreements were distributed to the participants. They were 1) a Conditional Sales Contract/Security Agreement; and 2) a Truckman's Agreement. Plaintiff signed the two agreements on July 27, 1978. The Truckman's Agreement was superceded, in 1979, by a Contractor Operating Agreement, with substantially similar terms. Plaintiff signed this Agreement on August 30, 1979.

*Exclusive Dealing Provisions*

The 1978 Truckman's Agreement provided that the operator would (1) lease the tractor unit to North American for its exclusive use; and 2) that the Company would agree to furnish and license a trailer for use with each tractor unit (Truckman's Agreement, ¶¶ 1, 2).

The 1979 Contractor Operating Agreement added the additional provision that the Contractor would have the right to "trip lease" with other Carriers, subject to North American's approval (Contractor Operating Agreement, ¶ 4).

*Insurance Provisions*

Both the 1978 and 1979 agreements provided for certain necessary types of insurance coverage. The 1978 Agreement provided that the Contractor agreed "to maintain and keep in force, or that Company may do so at Truckman's expense, property damage and liability insurance in amounts from time to time to be determined by the Company...." (Truckman's Agreement, ¶ 16). The 1979 Contractor Operating Agreement provided, in more detail, that the required insurance consisted of coverage for 1) bodily injury/property damage/cargo loss or damage resulting from negligence of the owner/operator; 2) bodily injury/property damage resulting when the tractor is operated without a trailer attached ("bobtail" coverage); and 3) trailer loss or damage resulting from the negligence of the owner/operator. (Contractor Operating Agreement, ¶ 16). Inserted following the first requirement listed in the Contractor Operating Agreement is the language "Contractor agrees to be charged for this protection ... unless Contractor provides Carrier with written notice declining said insurance program accompanied by evidence that Contractor has purchased elsewhere equivalent insurance that is satisfactory to Carrier...." Substantially similar language follows the other two provisions. *See id.* ¶ 16.

*Plaintiff's Employment*

Plaintiff alleges that, at the one-week training course in Fort Wayne, a NAVL representative discussed with Plaintiff's training class the required insurance as well as the terms of the Operating Agreement to be signed before the owner/operators received the tractor trailers for which they had contracted. The representative allegedly stated that North American would provide insurance for tractors, trailers, health, life, and disability because it could obtain lower premiums for the drivers than would otherwise be available. (Plaintiff's Brief in Support of Class Certification, at 12). Plaintiff alleges that he and the other prospective owner/operators felt compelled to accept this insurance plan because the company already had in its possession the down payments on the trucks. *Id.*

Plaintiff alleges that, in 1979, 1) North American began increasing the insurance premiums; 2) the frequency of the loads made available to plaintiff and other drivers decreased; 3) North American directed drivers to travel empty to locations where they then remained for two or three days; and 4) North American denied plaintiff over twenty trip-leases which were available to him through independent brokers. *Id.* at 16.

Plaintiff alleges that, because of these reasons, his financial condition began to deteriorate in 1979–80. In 1980, Plaintiff began seeking other employment, but allegedly could not obtain other work because North American would not relinquish title to the tractor. (Plaintiff's Brief, at 15). In 1981, Plaintiff incurred a net loss, and in October, 1981, his truck broke down. Unable to pay for the repairs or to buy a new truck, Plaintiff alleges that North American then terminated his Operating Agreement. *Id.*

*The Proposed Class*

Plaintiff has moved for class certification under Fed.R.Civ.P. 23(b)(3). The Complaint initially alleged that

The class of Plaintiffs includes all persons who have purchased motor vehicle liability and other insurance from Defendant in conjunction with entering into contractor operating agreements for

over-the-road tractors to be operated on behalf of Defendant.

(Complaint, ¶ 7).

At oral argument, and in Plaintiff's Reply Brief, the class was redefined to include "[at] a minimum ... all those drivers who defaulted because of their inability to triplease or pay North American's Insurance premiums for Property Damage and Product (sic) Liability and Workmen's Compensation Insurance." (Plaintiff's Reply Brief, at 5) (for "Product," read "Public"). Plaintiff argues that his claim and history are typical of those of the other defaulting drivers: that in 1979 and 1980, North American recruited 4,400 drivers and sold trucks to 4,200. Of the 4,200, it is alleged that 2,510, or approximately 60%, of the owner/operators defaulted or gave vehicles back to the Company. *Id.*, at 6.

*Discovery*

Prior to oral argument, Plaintiff conducted limited discovery into whether a class action should be maintained. 250 "interrogatories" were mailed to present and former drivers in an effort to clarify the "class." Only forty-four answers were filed with the Court as of the date of argument.

We will limit our discussion to the antitrust and RICO claims; the claim under the Pennsylvania statute clearly cannot apply to a nationwide class of former drivers. In addition, we will not consider, for purposes of this motion, Plaintiff's claim under section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45. The FTC Act does not provide for private rights of action, and we follow the decisions of numerous courts in so holding. *See Holloway v. Bristol-Myers Corp.*, 485 F.2d 986 (D.C.Cir.1973); *see also Dreisbach v. Murphy*, 658 F.2d 720 (9th Cir.1981); *Naylor v. Case & McGrath, Inc.*, 585 F.2d 557 (2d Cir.1978); *Fulton v. Hecht*, 580 F.2d 1243 (5th Cir.1978).

*Class Action Certification*

■ In order to maintain a class action, plaintiff must first demonstrate compliance with the mandatory requirements of Rule 23(a). Rule 23(a) provides that

One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a). If the initial prerequisites of Rule 23(a) are met, plaintiff must additionally meet the requirements of at least one of the three subsections of Rule 23(b). Plaintiff here seeks certification of the proposed class under Rule 23(b)(3), which provides that an action may proceed as a class action if

the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

Fed.R.Civ.P. 23(b)(3). "All the requirements enumerated must be satisfied by the proponent of certification before a class action determination may be made." *Piel v. National Semiconductor Corp.*, 86 F.R.D. 357, 364 (E.D.Pa.1980). *See also Scott v. University of Delaware*, 601 F.2d 76, 84 n. 14 (3d Cir.), *cert. denied sub nom. Estate of Scott v. University of Delaware*, 444 U.S. 931, 100 S.Ct. 275, 62 L.Ed.2d 189 (1979); *Katz v. Carte Blanche Corp.*, 496 F.2d 747, 756–57 (3d Cir.), *cert. denied*, 419 U.S. 885, 95 S.Ct. 152, 42 L.Ed.2d 125 (1974).

Plaintiff contends that all the requirements of Rule 23(a) are satisfied, and that this action is properly maintained under Rule 23(b)(3). Defendants have countered with a plethora of arguments against the propriety of class certification. Without addressing all of the arguments presented, we will deny Plaintiff's motion for class certification, finding that questions of law or fact common to the class do not predominate in this action.

In order to make the determination of whether issues common to the class predominate, it is necessary to examine the elements of plaintiff's claim and the scope of proof that will be required by the controlling substantive law. While not concerned with the merits of plaintiff's claim at this time, the inquiry involves, "at a minimum, the identification of the legal and factual issues, common and diverse, and an identification of the class members to which those relate." *Katz, supra,* at 756. Judge Aldisert has also written that the proper inquiry

> is not simply a matter of numbering the questions in the case, labelling them as common or diverse, and then counting up. It involves a sophisticated and necessarily judgmental appraisal of the future course of the litigation, as well as an evaluation of the most efficient means of proving the claims and the time that will be consumed by each aspect of the proof.

*Bogosian v. Gulf Oil Corp.,* 561 F.2d 434, 461–62 (3d Cir.1977) (Aldisert, J., dissenting), *cert. denied,* 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978).

## DISCUSSION

■ In any private antitrust action for damages, three elements must be proven: 1) a violation of the antitrust laws; 2) direct injury to the plaintiff caused by the violation (often referred to as fact of damage); and 3) damages. *Windham v. American Brands, Inc.,* 565 F.2d 59 (4th Cir.1977), *cert. denied,* 435 U.S. 968, 98 S.Ct. 1605, 56 L.Ed.2d 58 (1978). While tying and exclusive dealing agreements are prohibited by both section 1 of the Sherman Act and section 3 of the Clayton Act, the scope of section 3 is limited to commodities. *See, e.g., Hudson Valley Asbestos Corp. v. Tougher Heating & Plumbing Corp.,* 510 F.2d 1140, 1144–45 (2d Cir.), *cert. denied,* 425 U.S. 1011, 95 S.Ct. 2416, 44 L.Ed.2d 679 (1975).

■ Three elements are necessary to establish a *per se* illegal tie-in violation under the Sherman Act: 1) the seller must offer two distinct and separate products together, the tie being established by an agreement conditioning the sale of the tied product to separate purchase of the tying product; 2) a "not insubstantial" amount of commerce must be involved; and 3) the seller must have sufficient market power with respect to the tying product to appreciably restrain free competition in the market for the tied product. *See Bogus v. American Speech & Hearing Ass'n,* 582 F.2d 277, 286 (3d Cir.1978) (*citing Northern Pac. Ry. Co. v. United States,* 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958)); *Chase Parkway Garage, Inc. v. Subaru of New England,* 94 F.R.D. 330, 331 (D.Mass. 1982). In addition, and relevant to our discussion for class certification, is a fourth factor, fact of damage, that is, the consideration of whether a causal connection between the alleged violation and the injury is capable of being demonstrated on a class-wide basis. *See generally,* Matheson, *Class Action Tying Cases: A Framework for Certification Decisions,* 76 N.W.U.L. Rev. 855, 860 (1982) (hereafter "Matheson").

### The Alleged Conspiracy

Before taking up our analysis of whether or not common proof is feasible in this case, we will address plaintiff's conspiracy allegation. With respect to all the claims plaintiff has asserted that the existence of a conspiracy between North American and "others" to commit the alleged antitrust and RICO violations presents a common issue which will predominate over individual issues. (*See* Plaintiff's Brief in Support of Class Certification, at 24, 27, 37). The

mere allegation of conspiracy does not establish a common question, nor does it relieve plaintiff of its burden to satisfy the Court that common questions of proof will predominate. *See Chase Parkway Garage, Inc. v. Subaru of New England,* 94 F.R.D. 330, 332 (D.Mass.1982). Moreover, "[a] contract, combination or conspiracy necessarily requires two or more actors. 'It is axiomatic that unilateral activity by a single firm cannot be reached via this section.'" *Laurence J. Gordon, Inc. v. Brandt, Inc.,* 554 F.Supp. 1144, 1149 (W.D. Wash.1983) (quoting *Spectrofuge Corp. v. Beckman Instruments, Inc.,* 575 F.2d 256, 286 (5th Cir.1978), *cert. denied,* 440 U.S. 939, 99 S.Ct. 1289, 59 L.Ed.2d 499 (1979) (referring to section 1 of the Sherman Act)). Here, plaintiff has identified no other parties to the so-called conspiracy.

*The Insurance Tying Claim*

Plaintiff has alleged violations of section 1 of the Sherman Act and section 3 of the Clayton Act through North American's alleged practice of tying the sale of insurance to its sale of trucks.

■ The general definition of a tying arrangement has remained unchanged for many years. It is "an agreement by a party to sell one product but only on the condition that the buyer also purchase a different (or tied) product, or at least agrees that he will not purchase that product from another supplier." *Northern Pac. Ry. v. United States,* 356 U.S. 1, 5–6, 78 S.Ct. 514, 518–519, 2 L.Ed.2d 545 (1958). "[W]here the buyer is free to take either product by itself there is no tying problem even though the seller may also offer the two items as a unit at a single price." *Jefferson Parish Hospital Dist. No. 2 v. Hyde,* —— U.S. ——, —— n. 17, 104 S.Ct. 1551, 1558 n. 17, 80 L.Ed.2d 2, 12 n. 17 (1984). *See also Levicoff v. General Motors Corp.,* 551 F.Supp. 98, 102 (W.D.Pa. 1982), *aff'd,* 722 F.2d 732 (3d Cir.1983). The Supreme Court in *Jefferson Parish, supra,* emphasized that the essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer

into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms. —— U.S. at ——, 104 S.Ct. at 1558, 80 L.Ed.2d at 12.

Having considered the facts, in light of the applicable principles, we believe that the questions of a conditioned sale and fact of damage will require individual proof and preclude class certification.

### A. Conditioned Sale

In considering whether, in this case, a conditioned sale is susceptible to common proof, we first note that if the sale is expressly conditioned in the contract, a prima facie showing of · an illegal tie-in is made. This is because the question of a conditioned sale is focused on the defendant's form contract. *See* Matheson, *supra,* at 878; *Young v. Jo-Ann's Nut House,* 1980–81 Trade Cas. (CCH) ¶ 63, 746 at 77, 971 (D.N.J.1980).

Plaintiff seems to have taken conflicting positions on this question. *Compare* Plaintiff's Brief, at 12 ("Mr. Waldo, as did the other drivers going through the orientation course, felt compelled to accept this insurance from North American....") *and* at 27 ("While not expressly required by a uniform agreement; according to Mr. Waldo's testimony all of the drivers present at the time he joined North American purchased insurance through North American.") *with* Brief at 37 ("... if the claim is based on an express agreement (such as the truckman's agreement, etc.) proof of coercion on an individual basis does not need to be proven").

We find that nothing in the Truckman's Agreement or the Contractor Operating Agreement explicitly requires owner/operators to purchase insurance specifically and solely through North American. The contracts state that the operator must obtain insurance, and unless the operator secures insurance elsewhere and provides proof to the company of purchase, that the insurance would be provided by the Company. *See* Truckman's Agreement, ¶ 16, Contractor Operating Agreement, ¶ 16.

In *Ungar v. Dunkin' Donuts of America, Inc.*, 531 F.2d 1211 (3d Cir.), *cert. denied*, 429 U.S. 823, 97 S.Ct. 74, 50 L.Ed.2d 84 (1976) and *Bogosian v. Gulf Oil Corp.*, 561 F.2d 434 (3d Cir.1977), *cert. denied*, 434 U.S. 1086, 96 S.Ct. 1280, 55 L.Ed.2d 791 (1978), the Court of Appeals for the Third Circuit examined the propriety of certifying a class under Rule 23(b)(3) in cases involving franchise tying agreements where no express tie was specified in the respective agreements. In *Ungar*, the court held that "Where plaintiff franchisees placed no reliance on express contractual tie-ins, each, individually, must prove that his purchases were coerced as an element of establishing a prima facie case of illegal tying." *Ungar*, 531 F.2d at 1226. Because the tie-ins could only be proved on an individual basis, the requirements of Rule 23(b)(3) were not met and, consequently, the class could not be certified. Under *Ungar* and *Bogosian*, if a tying condition is expressly stated in a contract or fairly can be inferred from the operation of the contractual terms, a plaintiff need prove no more in order to prove the first element of a tying claim. "If, however, 'a class action tie-in claim is made, without basis in an express agreement, proof of salesmanship complied with inequality of bargaining power does not prove the existence of a tie, but rather proof of actual coercion on an individual basis is necessary to prove the existence of a tie.' In the former case, the suit may proceed as a class action; in the latter, however, class certification must be denied." *Young v. Jo-Ann's Nut House*, 1980–81 Trade Cas., ¶ 63, 746 at 77, 972 (D.N.J.1980); *See also Response of Carolina v. Leasco Response, Inc.*, 537 F.2d 1307, 1326–31 (5th Cir.) (coercion required when lease agreement specifies franchisee free to obtain putative tied product from any source), *cert. denied*, 419 U.S. 1050, 95 S.Ct. 626, 42 L.Ed.2d 645 (1974).

In light of the absence of an express contractual provision, we find that plaintiff has failed to carry the burden that there is a presumption of a common question, and we find that other extrinsic evidence will be necessary to prove the existence of the tie. We believe that, in light of the different training sessions in which drivers participated, proof of coercion will inevitably require individual proof. We do not believe that this case is akin to *Bogosian v. Gulf Oil Corp.*, 561 F.2d 434 (3d Cir.1977), *cert. denied*, 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978) which addressed the questions of contracts with provisions having the "practical economic effect" of precluding purchase of other products, if desired. *See Bogosian, supra,* at 452. Nothing on the face of these Agreements conditions the sale of a truck upon purchase of insurance *from North American:* without such express conditions, individual proof of coercion will be necessary to make out the element of a conditioned sale. *See also Daniels v. Amerco*, 1983–1 Trade Cas. (CCH) ¶ 65, 274, at 69, 615 (S.D.N.Y.1983); *Chase Pkwy. Garage Inc. v. Subaru of New England, Inc.*, 94 F.R.D. 330, 331–32 (D.Mass.1982); *Spain Equip. Co. v. Nissan Motor Corp.*, 29 Fed.R.Serv.2d, 937, 938 (N.D.Ala.1980); *Young v. Jo-Ann's Nut House, supra,* at 77, 971 (D.N.J.1980). It is simply not enough, even assuming North American had the sufficient economic power, that two products were purchased together. "In addition, it must be shown that the purchase was coerced into purchasing an unwanted product...." *Response of Carolina, Inc. v. Leasco Response, Inc.*, 537 F.2d 1307, 1327 (5th Cir.) *cert. denied*, 419 U.S. 1050, 95 S.Ct. 626, 42 L.Ed.2d 645 (1974).

Plaintiff cites the case of *F.T.C. v. Texaco*, 393 U.S. 223, 89 S.Ct. 429, 21 L.Ed.2d 394 (1968) for the principle that individual coercion need not be shown when the arrangement is "inherently coercive." Plaintiff cites the fact that 1) it was represented to all drivers that "North American's insurance" was the cheapest available; 2) the insurance premiums could be deducted from their paychecks; 3) North American already had the money for their tractors; and 4) of the 4,400 new drivers in 1979 and 1980, 2,510 drivers defaulted on their vehi-

cles "because of inability to make payments...." (*see* Plaintiff's Brief, at 27–28).

First, we hesitate to accept, on the facts before us, that the arrangement *is* "inherently coercive." Rather, as already stated, we believe this to be a matter of individual proof. Nor do we believe that the bald assertion that the 2,510 drivers defaulted "because of their inability to make payments" supports the argument for class certification (*see* our discussion of Fact of Damage, *infra*).

In *Wardell v. Certified Oil Co.*, 1982–1 Trade Cas. (CCH) ¶ 64, 477 (S.D.Ohio 1981) the court addressed the applicability of *Texaco* in a case brought under sections 4 and 16 of the Clayton Act for violations of sections 1 and 2 of the Sherman Act by independent gasoline dealers against the supplier-lessor for allegedly dictating the maximum resale price of cigarettes. In denying the motion for class certification, the court stated

> Plaintiff ... directs the Court's attention to *Federal Trade Commission v. Texaco* ... [Those] opinion[s] contain language which supports plaintiff's contention that coercion may be found to inhere in the unequal bargaining positions between an oil supplier and its dealers. Even so, plaintiff's conclusion that these cases would allow the requirement of individual coercion to be circumvented in the present case is tenuous. First, the Court is not persuaded that those cases are relevant to the case at bar. Both [*Shell*] and *Texaco* were enforcement proceedings brought by the Federal Trade Commission for unfair competitive practices under the Federal Trade Commission Act, not damage claims brought by private plaintiffs for violations of the Sherman Act. Also, the major focus of those cases was not on the vertical relationship between oil suppliers and their dealers, but on agreements between major, competing oil corporations. Second, as it was pointed out by the Third Circuit Court of Appeals in *Ungar, supra*, the presence of superior bargaining position and economic leverage of the supplier

over dealers is the rule rather than the exception. Such factors in themselves cannot constitute sufficient proof of coercion to establish violations of law.

> Plaintiff also argues that class wide coercion can be proved by showing that the bonus plan, with its cigarette pricing requirement, was applied uniformly to all independent dealers who form the class. Claims arising from this conduct would be based, however, on the allegedly coercive effect of the plan, and to find such coercive effects would still require analysis of individual facts and circumstances.

*Id.* ¶ 64, 477 at 72, 663. We agree and find this language dispositive.

### Fact of Damage

██ The antitrust laws were enacted for the protection of competition and not competitors. *See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977). Fact of damage is an essential element of antitrust liability, and contains two elements: 1) that an injury has been suffered; and 2) that the injury was caused by defendant's antitrust violation. *See* Clayton Act, § 4, 15 U.S.C. § 15 (1976); *Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 454 (3d Cir.1977), *cert. denied*, 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978); *Martino v. McDonald's System, Inc.*, 86 F.R.D. 145, 147 (N.D.Ill.1980).

At this stage, plaintiff need only show that proof of fact of damage would be made on a classwide basis. *Id.* As the Court stated in *Bogosian, supra*, "... [the] common proof [must] adequately demonstrate[s] some damage to each individual. Whether or not fact of damage can be proven on a common basis therefore depends upon the circumstances of each case." *Bogosian*, 561 F.2d at 454.

Plaintiff has claimed that the class consists of the 2,510 former drivers who allegedly "defaulted because of their inability to triplease or pay North American's premiums for Property Damage and Product (sic) Liability and Workmen's Compensation Insurance." Plaintiff's Reply Brief,

at 5. Where there is no express tie, and where each driver seems to have purchased different combinations of insurance (*see* Answers to Interrogatories: of 44 responses, 41 purchased tractor liability insurance, 43 purchased bobtail insurance, 27 purchased health and disability, and 26 purchased trailer insurance), we believe that fact of damage, *i.e.* that the alleged tie *caused* or even substantially contributed to the drivers' failure, is, at best, speculative.

In a price fixing case, it is reasonable to assume the classwide alternative of a less expensive alternative transaction. *See Martino, supra,* at 149 (citing *Hedges Enterprises, Inc. v. Continental Group, Inc.,* 81 F.R.D. 461 (E.D.Pa.1979)). "In tying arrangement cases, however, it is not clear that there will always be a more attractive alternative transaction that was foreclosed by defendants behavior; nor is it certain that a plaintiff always will have the financial means to avail himself of any potential alternatives. Thus, the burden is on the plaintiff to show the classwide availability of less expensive alternative transactions." *Martino, supra,* at 149 (citing *Cash v. Arctic Circle, Inc.,* 1980–1 Trade Cas. (CCH) ¶ 63, 095 (E.D.Wash.1979); *Krehl v. Baskin-Robbins Ice Cream Co.,* 78 F.R.D. 108 (C.D.Calif.1978)). As the court noted in *Martino,* it is not at all clear that each driver either had the inclination or ability to purchase insurance in an alternative transaction, rather than having the charges applied *pro rata* against future earnings. Not only would inquiry be necessary into the financial position of each driver at the time he signed on with North American, and the actions, if any, taken to locate alternative insurance, but it si uncertain whether many drivers had available an alternative transaction at any price. *See Martino, supra,* at 150. These are precisely the types of inquiry making class certification inappropriate. *See also Daniels v. Amerco,* 1983–1 Trade Cas. (CCH), ¶ 65, 274, at 69, 615 (S.D.N.Y.1983).

Finally, a relatd concept to fact of damage is the element of causation. *See Continental Ore Co. v. Union Carbide & Carbon Corp.,* 370 U.S. 690, 697–702, 82 S.Ct. 1404, 1409–1412, 8 L.Ed.2d 777 (1962). The class of 2,510 defaulting drivers obviously suffered injury; but the question of whether defendant's insurance sales caused the default presents individual issues.

> Similarly, where the enticement to the tie is an unusually favorable deal on the tying product, the net effect of the arrangement must be considered, both for possible disparities among class members and for the preliminary inquiry into the existence of actual injury.

*Matheson, supra,* at 387.

For these reasons, we believe that the questions as to the insurance tie-in arrangement are not suitable to determination on a class basis.

## EXCLUSIVE DEALING

Plaintiff alleges that both the 1978 Truckman's Agreement and the 1979 Contractor Operating Agreement impose exclusive dealing arrangements on drivers. Plaintiff further characterizes the alleged exclusive dealing requirements as "an unlawful tie-in arrangement violating section 1 of the Sherman Act and section 3 of the Clayton Act...." (*see* Plaintiff's Brief, at 19). *See* p. 810, *supra,* for a summary of the contractual provisions.

Plaintiff states that "[m]oreover, as discovery has shown the provision in paragraph 4 of the Contractor's Operating Agreement that drivers could triplease with North American's permission existed on paper only and did not represent an alternative for drivers to avoid the affects (sic) of the tie-in arrangement that they were to drive exclusively for North American." (Plaintiff's Reply Brief, at 3).

■ Simply characterizing an exclusive dealing arrangement as a tying arrangement does not necessarily make it one. In contrast to tying arrangements, which may satisfy the test of *per se* illegibility if three conditions are met, see p. 812, *supra.* The Supreme Court has held that a much broader economic analysis is required to determine the legality of exclusive contracts. *See generally Tampa Electric Co. v. Nash-*

*ville Coal Co.*, 365 U.S. 320, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961). Unlike tying arrangements, which are presumed to have a substantial adverse economic impact if they involve more than a *de minimis* amount of commerce, exclusive dealing contracts are found to be illegal only on direct proof of their economic impact. While such contracts may violate both section 1 of the Sherman Act and section 3 of the Clayton Act, the latter imposes " 'stiffer standards of anticompetitiveness' upon exclusive dealing arrangements than does section 1 of the Sherman Act." *T.A.M. Inc. v. Gulf Oil Corp.*, 553 F.Supp. 499, 504 (E.D.Pa.1982) (quoting *American Motor Inns, Inc. v. Holiday Inns, Inc.*, 521 F.2d 1230, 1239 (3d Cir.1975)). If no violation of section 3 is established, the arrangment is, *a fortiori*, lawful under the less restrictive provisions of the Sherman Act. *Id.* (citing *Tampa Electric Co. v. Nashville Coal Co.*, 365 U.S. 320, 327, 335, 81 S.Ct. 623, 627, 5 L.Ed.2d 580 (1961)). *In Tampa Electric*, the court set forth a three-part test for determining whether an exclusive arrangement violates section 3 of the Clayton Act: 1) the product or "line of commerce" must be defined on the basis of the facts of the case; 2) the relevant market area must be determined on the basis of the areas in which the seller operates and in which the purchaser can obtain supplies; and 3) "the competition foreclosed by the contract must be found to constitute a substantial share of the market," thereby significantly limiting the opportunities of other *sellers* to trade in the market. *Id.* at 327–28, 81 S.Ct. at 627–28. The mere existence of an exclusive dealing clause does not violate the antitrust laws. *See Bob Maxfield, Inc. v. American Motors Corp.*, 637 F.2d 1033, 1036 (5th Cir.), *cert. denied*, 454 U.S. 860, 102 S.Ct. 315, 70 L.Ed.2d 158 (1981). In fact, the Supreme Court has observed that exclusive dealing arrangements often promote competition. *See Standard Oil Co. v. United States*, 337 U.S. 293, 306, 69 S.Ct. 1051, 1058, 93 L.Ed. 1371 (1949). The evil attendant in such arrangements is that they may, in some circumstances,

create or extend market power of a supplier or the purchaser party to the exclusive dealing arrangement, and may thus restrain horizontal competition. Exclusive dealing can have adverse economic consequences by allowing one supplier of goods or services unreasonably to deprive other suppliers of a market for their goods, or by allowing one buyer of goods unreasonably to deprive other buyers of a needed source of supply. In determining whether an exclusive dealing contract is unreasonable, the proper focus is on the structure of the market for the products or services in question— the number of sellers and buyers in the market, the volume of their business, and the ease with which buyers and sellers can redirect their purchases or sales to others. Exclusive dealing is an unreasonable restraint on trade only when a significant fraction of buyers or sellers are frozen out of a market by the exclusive deal. When the sellers of services are numerous and mobile, and the number of buyers is large, exclusive dealing arrangements of narrow scope pose no threat of adverse economic consequences. To the contrary, they may be substantially procompetitive by ensuring stable markets and encouraging long term, mutually advantageous business relationships. *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, —— U.S. ——, —— – ——, 104 S.Ct. 1551, 1575–1576, 80 L.Ed.2d 2, 33–34 (O'Connor, J., concurring). These arrangements are analyzed under the Rule of Reason. *Id.*

Here, we must determine whether the allegations of an illegal exclusive dealing arrangement are susceptible to proof on a class-wide basis. Plaintiff entered into two contracts with North American in addition to the Sales Contract: the Truckman's Agreement, signed by plaintiff in 1978 at the time of purchase, and the Contractor Operating Agreement, signed in 1979, which superceded the Truckman's Agreement. The Truckman's Agreement limited operation exclusively to service for North American. The Contractor Operating

Agreement set forth the same condition, but provided for trip-leasing with the permission of the Company. Plaintiff takes the position that the two agreements, while including different terms as to exclusivity, operated the same as to Plaintiff:

> Plaintiff and Defendant also entered into a truckmen's agreement and a contractor operating agreement (hereinafter Operating Agreements), which by language therein and the insurance required pursuant to the terms of the security agreement limited the Plaintiff's motor vehicle exclusively to the business and service of the defendant.

(Complaint, ¶ 13).

Plaintiff also claims that "[b]y refusing to permit the Plaintiff to enter into so-called 'trip-lease' agreements with other carriers and at the same time refusing to deal with Plaintiff, Defendant, through its agents, servants and employees, conspired and agreed to boycott the Plaintiff in the operation of his business." Complaint, ¶ 23.

Plaintiff asserts that the two contracts operated in exactly the same manner to require exclusive dealing with North American. Plaintiff states:

> "Moreover, as discovery has shown the provision in paragraph 4 of the Contractor's Operating Agreement that drivers could triplease with North American's permission existed on paper only and did not represent an alternative for drivers to avoid the affects (sic) of the tie-in arrangement that they were to drive exclusively for North American." Plaintiff's Reply Brief, at 3. Plaintiff asserts that of 35 drivers or former drivers who responded to interrogatories as to whether they had been denied the right to triplease, 22 replied in the affirmative. *Id.* n. 1.

We have reviewed the 44 answers received in discovery. By our count, 21 drivers stated that they had trip-leased; 17 had been given permission to trip-lease, and 27 stated that they had been denied permission to trip-lease. Plaintiff states that on only one occasion during his employment with North American was he given permis-

sion to trip-lease, *See* Plaintiff's Brief, at 16. Plaintiff alleges that he was denied over 20 trip-leasing opportunities available to him through independent brokers. *Id.*

We find, from reviewing the answers to interrogatories, that individual questions with regard to the exclusive dealing claim will predominate over the common issues. Questions of fact of damage alone militate against class certification, where 21 drivers were, in fact, allowed to trip-lease, countering the allegation made by plaintiff that the provision existed only on paper. From the differing responses themselves, we believe that whether an exclusive dealing arrangement existed at all under the 1979 Agreement is called into question. Further, if such an arrangement was allegedly enforced as to some drivers, this situation presents individual issues. Finally, Plaintiff seems to wish to treat the two contracts as identical, even though the provisions differ. We are hesitant to do this; even if we could distinguish the two, however, we have no information as to which and how many drivers drove under each contract, and how or whether this would affect plaintiff's proof. For the foregoing reasons, we believe the allegations as to exclusive dealing to be too unclear to certify it as a class-wide issue. Even if we found the allegations to be clear, we hold that because of the differing responses in the interrogatories, questions of individual proof would be required to demonstrate fact of injury, if in fact, an antitrust injury has occurred.

## RICO

 Plaintiff amended his complaint to include a claim for damages and injunctive relief under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.* The amended complaint alleges, by incorporation of the original complaint, that North American

> has by use of the United States Mail, and telephone, engaged in a pattern of racketeering activity which has caused injury to the business of Plaintiff and Plaintiff Class and has otherwise violated Section 1962 of the Racketeer Influence (sic) and

Corrupt Organization Act 18 U.S.C. Section 1962

Amended Complaint, ¶ 30.

Information noticeably lacking in the amended complaint was recently provided to the Court in Plaintiff's Supplemental Brief relating to its RICO claim. In his brief plaintiff alleges that 1) North American was the RICO enterprise, and 2) defendant's conduct violated 18 U.S.C. § 1962(c). The amended complaint states that "the corporation sent out recruiting literature to potential drivers which the testimony shows was silent about the turn overrate (sic) or that North American recruited far more drivers than it could provide business for. The pattern of racketeering activity includes acts of mail fraud and wire fraud." Plaintiff's Supplemental Brief, at 16–17.

We have, on two occasions in recent months, considered the elements of RICO in some detail. *See Joseph v. Algemene Bank Nederland, N.V.,* No. 83–2281 (W.D.Pa. March 29, 1984); *Chambers Development Co., Inc. v. Browning-Ferris Industries, et al.,* 590 F.Supp. 1528 (W.D.Pa.1984). In *Chambers,* we held that complaints brought under RICO alleging claims of mail and wire fraud as predicate offenses must be pleaded with specificity pursuant to Fed.R.Civ.P. 9(b). *See id.* at 1537 No such allegations are present in this case. We find the bare allegation of a RICO violation, in conjunction with equally inadequate factual allegations, insufficient to state a RICO claim; thus, we do not have a basis for making a determination as to class certification. *See, e.g. Eaby v. Richmond,* 561 F.Supp. 131, 136–37 (E.D. Pa.1983). *See also Segal v. Gordon,* 467 F.2d 602 (2d Cir.1972); *Kimmel v. Peterson,* 565 F.Supp. 476 (E.D.Pa.1983) (citing cases). We have no information before us as to whom the allegedly deceptive brochures were mailed. We have no allegations that all members of the alleged class of terminated drivers received the brochures, or what specific information was or was not included in one or more brochures. The interrogatories did not address what brochures or mailings were received by drivers. We find the information provided critically deficient in ruling on a motion for class certification.

In addition, section 1964(c) of RICO permits a plaintiff to recover treble damages only if he is "injured in his business or property by reason of a violation of section 1962." 18 U.S.C. § 1964(c). We have held in previous opinions that a plaintiff need not allege a "RICO injury" *see Algemene Bank, supra,* at 12; *Chambers, supra,* at 21. The injuries discussed elsewhere in this opinion allegedly flowed from antitrust violations. We held that the fact of injury would require individual proof. We are unsure what injury is alleged to have been suffered *because of the RICO violation.* If the injury alleged is the same as those under the other claims, we hold, in light of our previous discussion, that it will require proof on an individual basis.

*Conclusion*

 In examining the pleadings in this case together with the fruits of the discovery, we were looking, in large part, to determine whether there was a class of which plaintiff's claim was common, typical, and sufficiently numerous to justify class certification. *See Piel v. National Semiconductor,* 86 F.R.D. 357, 365 (E.D. Pa.1980). Plaintiff has alleged that the class consists of the 2,510 drivers who allegedly defaulted because of the tying and exclusive dealing practices of North American. 250 questionnaires were sent, and 44 returned. Questionnaires had been sent to present and former drivers; problematically, however, the class was redefined by Plaintiff at oral argument after a year of discovery to include only drivers who had defaulted. Only 44 returned the interrogatories. 30 of these were current drivers, 12 were not driving for defendant, 1 had been terminated, and one was in the process of terminating. Thus, after a year of discovery, the Court finds itself in the position of having little more idea about the characteristics of the class than when the Complaint was filed. In addition to the reasons previously cited for denying class certifica-

tion, we have no clear impression as to the actual size of the class, necessary to a finding under Fed.R.Civ.P. 23(a) that states that certification must be grounded on a finding that the joinder of all members is impracticable. *See Dudo v. Schaffer*, 93 F.R.D. 524, 525–26 (E.D.Pa.1982). The requirements under Rule 23 cannot "be boldly thrown aside in order to create hybrid proceedings wherein there would be no class representative, but, in effect, one massive joinder of 1,400 individual claims." *Commonwealth v. Local Union 542, Int'l Union of Operating Engineers*, 90 F.R.D. 589, 593 (E.D.Pa.1981).

Here, we find that Plaintiff has failed to establish that there is a class of claimants with similar claims; failed to establish that his claims are representative; failed to establish the number in the class, and failed to establish theories of liability suitable for class treatment. The preponderance of individual issues in this case will not promote judicial economy. We would anticipate a plethora of mini-trials related to each default to determine 1) whether there was an insurance tie-in; 2) how it related to a subsequent default; 3) how any alleged exclusive dealing arrangement related to any default; and 4) how alleged RICO violations contributed to the injuries suffered. Inquiry into the reasons for each and every default would make the proceedings both interminable and unmanageable. We will, therefore, deny Plaintiff's Motion.