[Cite as *Ford Motor Credit Co. v. Agrawal*, 2011-Ohio-6474.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 96413**

## FORD MOTOR CREDIT COMPANY

PLAINTIFF-APPELLANT

vs.

## SUDESH AGRAWAL

DEFENDANT-APPELLEE

**JUDGMENT:**
AFFIRMED IN PART,
REVERSED IN PART

Civil Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CV-536588

**BEFORE:**   Celebrezze, P.J., Jones, J., and E. Gallagher, J.

**RELEASED AND JOURNALIZED:**   December 15, 2011

**ATTORNEYS FOR APPELLANT**

Irene C. Keyse-Walker
Tucker Ellis & West, L.L.P.
1150 Huntington Building
925 Euclid Avenue
Cleveland, Ohio   44115-1414

Brett K. Bacon
Gregory R. Farkas
Colleen C. Murnane
Frantz Ward, L.L.P.
127 Public Square
25th Floor
Cleveland, Ohio   44114-1999

Thomas M. Byrne
Stacey M. Mohr
Valerie S. Sanders
Sutherland Asbill & Brennan, L.L.P.
999 Peachtree Street, N.E.
Atlanta, Georgia   30309-3996


**ATTORNEYS FOR APPELLEE**

Anand N. Misra
The Misra Law Firm, L.L.C.
3659 Green Road
Suite 100
Beachwood, Ohio   44122

Robert S. Belovich
9100 South Hills Boulevard
Suite 300
Broadview Heights, Ohio   44147

FRANK D. CELEBREZZE, JR., P.J.:

**Introduction**

{¶ 1}   Appellant, Ford Motor Credit Company ("Ford Credit"), challenges the trial court's January 18, 2011 order granting nationwide class certification and certification of an Ohio subclass in favor of appellee, Sudesh Agrawal.  Ford Credit argues that class certification is inappropriate.   For the reasons stated below, we affirm the certification of the class, with one exception: class certification of Agrawal's claim for actual damages under the Consumer Leasing Act ("CLA") is reversed.

{¶ 2}   The controversy arises from Agrawal's lease of a Windstar minivan from a Ford dealer under Ford Credit's Red Carpet Lease ("RCL") program in 2000.  Lease provisions under the RCL program specify that lessees "may be charged for excessive wear *based on our standards for normal use*" and that the lessee is "responsible for repairs of All Damages which are not a result of normal wear and use * * *.   You will pay the estimated costs of such repairs, even if the repairs are not made prior to Holder's sale of the Vehicle."   (Emphasis added.)

**Ford Credit's Red Carpet Lease Program**

{¶ 3}   Since 2006, Ford Credit has used third-party inspectors to inspect leased vehicles for excess wear and use ("EWU") at lease end.  Prior to 2006, including when Agrawal returned his vehicle in 2003, Ford dealers across the country performed those inspections using Ford Credit guidelines and templates.

**{¶ 4}** The RCL dealer handbook, one such procedure document, is given to Ford dealers or is available to them through Ford Credit's website. Additionally, Ford Credit provides templates to its dealers for use in performing wear and use inspections. The handbook instructs inspectors that "the 'inspection standard' is equivalent to a 'clean' rather than 'average' used vehicle." Internal Ford Credit documents explain that "clean" means the "vehicle is in great condition with only minor dents and chips in body panels," whereas "average" means the "vehicle will have normal wear and tear with dents, chips and scratches in body panels."

**{¶ 5}** The program's lease-end process requires the lessee to present the leased vehicle to a Ford dealer for an EWU inspection. The dealer-inspector then conducts the inspection in accordance with Ford Credit's instructions and enters the results on a Ford Credit form called the Vehicle Condition Report ("VCR"), which has seven carbon plies. Plies one through three are identical, but are different from plies four through seven, which provide columns for additional inspections. The lessee receives ply two, which does not show the columns for additional inspections.

**{¶ 6}** The results of the dealer-inspector's findings are entered in column one of the VCR. Body shop personnel then enter cost estimates for each condition noted by the dealer-inspector. This dealer-inspection is referred to below as the "First Inspection."

**{¶ 7}** Following the First Inspection, the dealer-inspector sends Ford Credit the VCR along with any funds collected from the lessee. Ford Credit then includes any unpaid but assessed EWU charges in a final bill sent to the lessee.

**{¶ 8}** Next, the vehicle is transported from the dealer to an auction location. While in transport, another inspection is made by the transporter; the purpose of which is to check for any damage that may occur during transportation. No cost estimates are made for the transporter-inspection, nor are Ford inspection guidelines used. The results of this transporter-inspection are then entered in column two of the VCR.

**{¶ 9}** Pursuant to the RCL handbook, the "dealer will be financially responsible for any under reported excess wear and use charges." If the EWU charges are over reported, the dealer has no corresponding responsibility. Ford Credit's standard operating procedures prescribe a "Second Inspection" in order to determine whether the dealer has "under reported" the EWU charges during the First Inspection.

**{¶ 10}** Therefore, once the vehicle is delivered to the auctioneer, another inspection and estimate is made. This inspection is performed according to Ford Credit's guidelines. The purpose of this inspection is "to insure that the dealer has actually followed the standards of wear and use." The auctioneer-inspection results, along with cost estimates, are entered into column three of the VCR. The auction-inspector then computes a difference between the First Inspection and the Second Inspection and enters this amount into the VCR. If the variance shows an underestimate, then a further verifying inspection is conducted by a "Senior Auction Inspector." No such verifying inspection occurs when the dealer estimate is greater than the auction estimate. If the variance is confirmed by the Senior Auction Inspector to be $200 or more, then this variance becomes the basis for imposing financial responsibility on the dealer-inspector.

## Statement of the Case

{¶ 11} Agrawal returned his vehicle to the Ford dealership in May 2003, after making all monthly payments on his lease. Upon inspecting his vehicle, the Ford dealer estimated EWU charges of $2,658. Following the First Inspection, and unbeknownst to Agrawal, a Second Inspection found EWU charges in the amount of $194. However, Ford Credit, utilizing the initial estimate, billed Agrawal $2,658.

{¶ 12} Agrawal disputed the charges and, on March 11, 2004, Ford Credit filed this action in the Shaker Heights Municipal Court, seeking $2,658 in unpaid EWU charges. Agrawal filed a counterclaim against Ford Credit on June 7, 2004. The case was transferred to the Cuyahoga County Court of Common Pleas based on Agrawal's request for damages in excess of the municipal court's jurisdiction.

{¶ 13} On February 16, 2006, Agrawal amended his original counterclaim, asserting eight claims against Ford Credit based on Ford Credit's assessment of EWU charges: (1) a class claim for "unconscionable leasing practices"; (2) a class claim for violation of public policy; (3) a class claim for breach of contract; (4) a class claim for violation of the federal Consumer Leasing Act ("CLA"), 15 U.S.C. Section 1667a; (5) a class claim for fraud; (6) a class claim for unfair and deceptive trade practices; (7) a claim for unlawful tax, which later was dismissed voluntarily; and (8) an individual claim for violation of the Ohio Consumer Sales Practices Act, R.C. 1345.01.

{¶ 14} Agrawal's principle allegations underlying the class claims are that the "normal" standard stated in Ford Credit's lease is different than the "clean" standard

stated in Ford's RCL dealer handbook. He points to Ford documents to show that "clean" is a more stringent standard than "average," which is defined as having "normal wear and tear." Thus, Agrawal argues that Ford Credit misrepresents the applicable standard in the lease and correspondingly fails to conduct an inspection in accordance with the standard stated in the lease. Agrawal further alleges that Ford Credit's operating procedure requiring the dealer to be responsible only for underestimates creates incentives for the First Inspection to be biased towards an overcharge. Moreover, he argues that the fact that Ford Credit requires the related Second Inspection demonstrates the biased nature of the First Inspection.

{¶ 15} On August 15, 2007, Ford Credit moved for summary judgment on Agrawal's counterclaims. On January 25, 2008, Agrawal filed a motion for class certification. On December 17, 2010, the court granted Ford Credit's motion for summary judgment on Agrawal's claim for violation of the Consumer Sales Practices Act. The court denied the motion as to the remaining claims.

{¶ 16} On January 18, 2011, the trial court granted Agrawal's motion for class certification, certifying a nationwide class and an Ohio subclass. After concluding that the prerequisites of Civ.R. 23(A) were met, the court went on to hold a class action maintainable under both Civ.R.23(B)(2) and (B)(3). In its January 18, 2011 order, the trial court certified two classes, a nationwide class and an Ohio subclass:

{¶ 17} "Agrawal has stated the following criteria for identifying members of the class and subclass: (i) signed a Red Carpet Lease as lessee or co-lessee for personal use,

(ii) the lease contained certain wear and lease terms, (iii) lease was signed on or after October 1995 in one of the 50 States or the District of Columbia, (iv) wear and use charges were assessed to lessees by Ford at lease end. In addition, for membership in the Ohio subclass, the lease must have been: (i) initiated or terminated in Ohio and (ii) the wear and use estimate in the Second Inspection must have been greater than the estimate from the First Inspection."

## Law and Analysis

### A. Class Certification Under Civ.R. 23(B)(3)

{¶ 18} Ford Credit first argues that "[t]he trial court erred in certifying a class and subclass under Civ.R. 23(B)(3)." In *Baughman v. State Farm Mut. Auto. Ins. Co.*, 88 Ohio St.3d 480, 2000-Ohio-397, 727 N.E.2d 1265, the Ohio Supreme Court reaffirmed that the standard of review to be applied for class action certification is that of an abuse of discretion. A trial court possesses broad discretion in determining whether a class action may be maintained. That determination will not be disturbed absent a showing that the discretion was abused. Id. An abuse of discretion implies that the trial court's attitude was unreasonable, arbitrary, or unconscionable. *Beder v. Cleveland Browns, Inc.* (1998), 129 Ohio App.3d 188, 717 N.E.2d 716. The trial court's decision regarding the certification of a class should not be reversed on appeal because the appellate judges would have decided the issue differently had the initial determination been in their hands. *Hamilton v. Ohio Sav. Bank*, 82 Ohio St.3d 67, 1998-Ohio-365, 694 N.E.2d 442.

{¶ 19} The class action is an invention of equity. Its purpose is to facilitate adjudication of disputes involving common issues between multiple parties in a single action. *Planned Parenthood Assn. of Cincinnati, Inc. v. Project Jericho* (1990), 52 Ohio St.3d 56, 62, 556 N.E.2d 157. The plaintiff bears the burden of establishing the right to a class action. *Shaver v. Standard Oil Co.* (1990), 68 Ohio App.3d 783, 589 N.E.2d 1348. Class certification in Ohio is based on Rule 23 of the Ohio Rules of Civil Procedure, which is identical to Rule 23 of the Federal Rules of Civil Procedure, so federal law is also useful in analyzing a given situation.

{¶ 20} In *Warner v. Waste Mgt., Inc.* (1988), 36 Ohio St.3d 91, 521 N.E.2d 1091, the Ohio Supreme Court listed seven elements necessary for a class to be certified. In determining whether a class action is properly certified, the first step is to ascertain whether the threshold requirements of Civ.R. 23(A) have been met. Once those requirements are established, the trial court must turn to Civ.R. 23(B) to discern whether the purported class comports with the factors specified therein. Accordingly, before a class may be certified as a class action, a trial court must make seven affirmative findings. *Warner* at paragraph one of the syllabus.

{¶ 21} Four prerequisites are explicitly set forth in Civ.R. 23, while two prerequisites are implicit in the rule. Id. The two implicit prerequisites are (1) that the class must be identifiable and unambiguously defined and (2) that the class representatives must be members of the class. Id. at 96.

**{¶ 22}** The four delineated prerequisites in Civ.R. 23(A) include: "(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims and defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class." Id. at 97, quoting Civ.R. 23(A). Except as commonality relates to predominance, Ford Credit limits its arguments on appeal to the requirements in Civ.R. 23(B).

**{¶ 23}** Finally, the trial court must also find that one of the Civ.R. 23(B) requirements are met before the class may be certified. Id. at 94; see, also, *Hamilton*. If the class movant fails to meet one of these requirements, class certification must be denied.

**{¶ 24}** Civ.R. 23(B)(3) requires that the questions of law or fact common to the members of the class predominate over any questions affecting individual members. As stated in *Hamilton*, "Civ.R. 23(B)(3) provides that an action may be maintained as a class action if, in addition to the prerequisites of subdivision (A), 'the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.'" Id. at 79-80.

### i. Predominance

{¶ 25} Ford Credit first argues that Agrawal fails to meet the requirements for class certification under Civ.R. 23(B)(3), predominance.

{¶ 26} In order to satisfy the predominance requirement, Agrawal must show that the common questions of law and fact represent a significant aspect of the class and are capable of resolution for all members of the class in a single adjudication. *Shaver v. Standard Oil Co.* at 799; *Wal-Mart Stores, Inc. v. Dukes* (2011), 564 U.S. ___, 131 S.Ct. 2541, 180 L.Ed.2d 374. The mere assertion that common issues of law or fact predominate does not satisfy the express requirements under the rule. In *Waldo v. N. Am. Van Lines, Inc*. (W.D.Pa. 1984), 102 F.R.D. 807, the court stated: "[It] is not simply a matter of numbering the questions in the case, [labeling] them as common or diverse, and then counting up. It involves a sophisticated and necessarily judgmental appraisal of the future course of the litigation * * *." Id.

{¶ 27} Where the circumstances of each proposed class member need to be analyzed to prove the elements of the claim or defense, then individual issues would predominate and class certification would be inappropriate. *Schmidt v. Avco Corp*. (1984), 15 Ohio St.3d 310, 314, 473 N.E.2d 822. Here, appellant contends that the predominance requirement cannot be met where individualized inquiry into each EWU appraisal is inescapable based on the nature of Agrawal's claim.

**1.**

{¶ 28} Initially, appellant argues that establishing liability would require a fact-specific inquiry into the details of every individual lease-end inspection in order to

determine whether the dealer, in fact, applied the "clean" standard during the lease-end appraisal.

{¶ 29} Ford Credit's argument relies on *Young v. FirstMerit Bank, N.A.*, Cuyahoga App. No. 94913, 2011-Ohio-614; *Linn v. Roto-Rooter, Inc.*, Cuyahoga App. No. 82657, 2004-Ohio-2559; *Hoang v. E\*Trade Group, Inc.*, 151 Ohio App.3d 363, 2003-Ohio-301, 784 N.E.2d 151; and *Augustus v. Progressive Corp.*, Cuyahoga App. No. 81308, 2003-Ohio-296.  After a thorough review of these cases, we conclude that they are distinguishable from the case at hand.

{¶ 30} In *Young v. FirstMerit Bank*, a group of defrauded investors brought a putative class action against a bank where the scheme perpetrator had deposited the funds received from the fraudulent sale of unregistered securities.  The plaintiffs asserted claims on behalf of a class against the bank for aiding and abetting the sale of unregistered securities in violation of Ohio law, civil aiding and abetting of fraud, and conspiracy to commit fraud.  This court reversed the trial court's certification of a class of individuals who had purchased a promissory note and made payment by check into the account, concluding the predominance requirement was not met.

{¶ 31} This court determined the necessary element of reliance was not susceptible to class-wide liability and would require individualized determinations of what representations, if any, were relied upon by each plaintiff in deciding to invest in the scheme.  This court stated, "[i]n the instant case, the crucial distinction is that the evidence illustrates that the fraudulent conduct was not standardized, nor were the

representations identical, nor were they set forth on the promissory notes. Rather, the oral representations by [the scheme perpetrator] occurred during 'negotiations.'" *Young* at ¶32.

{¶ 32} *Linn v. Roto-Rooter* focused on Roto-Rooter's practice of including a "miscellaneous supplies charge" on all of its customer invoices, regardless of whether a particular customer had received any of the so-called miscellaneous supplies. Id. at ¶2. Linn, a Roto-Rooter customer, sought certification of a class of all persons who had been charged the miscellaneous supplies charge by Roto-Rooter during a particular time period. Id. at ¶6.

{¶ 33} This court reversed the trial court's class certification because common questions of fact did not predominate. Id. at ¶13. The court stated that "Roto-Rooter's liability hinges on whether a customer actually received little or no miscellaneous supplies to establish that the charge was unjust or fraudulent." Id. at ¶16. Accordingly, the class was not appropriate because it included individuals who were not injured by the miscellaneous supplies charge.

{¶ 34} In *Hoang v. E*Trade Group, Inc*., defendants offered an online investing service, representing fast, accurate, and reliable service. The plaintiff sought class certification, contending that defendant's representations were false and inaccurate. The plaintiff maintained that, because of interruptions in service, she and others similarly situated had suffered losses. She argued that every E*Trade customer was injured

simply because they could not access their E*Trade accounts during the times of interruption.   This court disagreed.

**{¶ 35}** This court reasoned that "[t]his analysis is complex because it requires consideration of each individual transaction, other transactions in the same security that occurred in the market, and the market conditions at the time, including the number of orders waiting to be executed in the market, the size and type of those orders, and other factors."   Id. at ¶25.   We found that because "establishing liability would require a fact-specific inquiry into the details of every individual transaction," class certification was not suitable.

**{¶ 36}** In *Augustus v. Progressive Corp.*, the plaintiff alleged that defendant insurer had a policy that required the use of cheap, poor quality "imitation parts" for repairing automobiles that were covered under the policies.   The policies provided that the insurer was obligated to restore the vehicle to its "pre-loss value."   However, this court noted that the use of imitation parts was permitted under the policy, so long as the use of such parts allowed the defendant to restore the vehicle to its pre-loss value. Finding that the trial court did not abuse its discretion in denying the class certification, this court reasoned:

**{¶ 37}** "The fact that the appellees utilized imitation or non-OEM parts is without question and not in dispute.   Rather, the more relevant inquiry is whether each vehicle was restored to its 'pre-loss condition' when a limited number of non-OEM parts were utilized in making covered repairs.   In following this line of inquiry, it would only reason

that the determination of 'pre-loss condition' could only be made by individually examining each and every putative class member's vehicle. Since each and every accident varies, and each and every accident would require different types of repairs, it would be inconceivable to conclude that a question of fact common to the class predominates. * * * The numerous individual questions involved would make it virtually impossible to properly evaluate the facts and apply the law in the instant matter." Id. at ¶25, 28. Thus, plaintiff's claim for breach of the policy could not be determined simply by evaluating the defendant's standardized policy and practices. Rather, a subjective investigation into each vehicle repair was required.

{¶ 38} Appellant argues that, as in *Young*, *Linn*, *Hoang*, and *Augustus*, "regardless of what policies or standards are alleged to exist, the alleged existence of those standards cannot prove that Ford Credit breached its lease obligation as to valuation of EWU. The allegedly inconsistent 'clean' standard would have to be shown to have been applied" on a case-by-case basis in order to establish liability.

{¶ 39} However, appellant's reliance on *Young*, *Linn*, *Hoang*, and *Augustus* is misplaced. In this matter, individualized inquiry into whether the "clean" standard was actually applied to the detriment of each individual lease holder is not required. Contrary to the circumstances in *Young*, *Linn*, *Hoang*, and *Augustus*, Ford Credit's lease agreement and inspection procedure documents, standing alone, constitute evidence of class-wide injury. A determination of Ford Credit's liability can be assessed on an objective standard and does not require a subjective inquiry of the individual actions of each

defendant, as was the case in *Young, Linn, Hoang*, and *Augustus*.  As *Linn* noted, "when evidence of a defendant's deceitful or fraudulent conduct is set forth in a standardized contract distributed to many and resulting in class-wide injury, then such a case is ideal for class certification."  This case contains such a scenario.

{¶ 40} In our view, this case is more analogous to *Cope v. Metro. Life Ins. Co.*, 82 Ohio St.3d 426, 1998-Ohio-405, 696 N.E.2d 1001.  In *Cope*, the plaintiffs alleged that an insurance company improperly targeted existing policyholders, sold them replacement insurance as new insurance, and intentionally omitted mandatory disclosure warnings.  In certifying the class in that case, the Ohio Supreme Court reasoned that "a wide variety of claims may be established by common proof in cases involving similar form documents or the use of standardized procedures and practices."  Id. at 430.  "'Frequently numerous consumers are exposed to the same dubious practice by the same seller so that proof of the prevalence of the practice as to one consumer would provide proof for all.  Individual actions by each of the defrauded consumers are often impracticable because the amount of individual recovery would be insufficient to justify bringing a separate action; thus an unscrupulous seller retains the benefits of its wrongful conduct.'"  Id. at 429, quoting *Vasquez v. Superior Court of San Joaquin Cty*. (1971), 4 Cal.3d 800, 808, 94 Cal.Rptr. 796, 484 P.2d 964.

{¶ 41} The high court went on to elucidate that "[i]t is now well established that 'a claim will meet the predominance requirement when there exists generalized evidence which proves or disproves an element on a simultaneous, class-wide basis, since such

proof obviates the need to examine each class member's individual position.'"  Id. at 429-430.

{¶ 42} As in *Cope*, Agrawal's claims against Ford Credit, including violation of the CLA, breach of contract, and common law fraud, "involve[] the use of form documents, standardized practices and procedures, common omissions spelled out in written contract, and allegations of [a] widespread scheme to circumvent statutory and regulatory disclosure requirements, any one of which has been held to warrant class action treatment."  *Cope* at 437.

{¶ 43} As discussed by the trial court in this matter:

{¶ 44} "Agrawal has presented evidence that the challenged wear and use terms are substantially similar, if not identical, and are stated in the standard lease forms utilized by Ford Credit for its Red Carpet Lease program.  Furthermore, the challenged lease-end practices are governed by written operating procedures created and utilized by Ford Credit for the Red Carpet Lease program.  The disputed 'clean' standard is stated in Ford Credit's Red Carpet Lease Dealer Handbook.  The Second Inspection and the provision for the inspector's liability for underestimates of wear and use are also stated in written Ford Credit procedures.  Finally, certain templates created by Ford Credit and given to inspectors for use during wear and use inspections also apply to Red Carpet Leases generally."

**Consumer Leasing Act**

{¶ 45} Passed by Congress as an amendment to the Truth In Lending Act ("TILA"), 15 U.S.C. §§1601 et seq., the CLA purports "to assure a meaningful disclosure" of personal property lease terms to "enable the lessee to compare more readily the various lease terms available to him [and] limit balloon payments in consumer leasing." 15 U.S.C. §1601(b). Regulation M provides a list of disclosures for consumer leases. 12 C.F.R. §213.4. The Regulations under the CLA, specifically 12 C.F.R. §213.4(h)(2), obligate a lessor to disclose its EWU standards and further require that the standards be reasonable. Additionally, 12 C.F.R. §213.3(b) requires that information stated in the lease not be misleading. A plaintiff suing pursuant to section 1667b(b) may seek relief under TILA's damages provision for actual and statutory damages. 15 U.S.C. §1640.

{¶ 46} Agrawal's CLA class claims allege that: (1) Ford Credit failed to disclose its inspection standard; (2) failed to disclose its inspection method; and (3) utilizes an inspection standard that is unreasonable.

{¶ 47} As discussed above, Ford Credit's lease agreement affirmatively states that it will use a "normal" EWU inspection standard, while its procedures mandate the use of a higher and undisclosed "clean" standard. Accordingly, appellant's allegation that Ford Credit's failure to disclose its inspection method and the "clean" EWU inspection standard in its lease agreements violated the CLA does not require individualized inquiry to the actual inspections conducted on specific vehicles. Liability on such claims depends on the same legal analysis for each member and the same evidence, including the

standard written RCL agreement forms, the related written RCL dealer handbook, and Ford Credit's nationwide procedures for performing lease-end inspections. Despite appellant's contentions to the contrary, establishing liability as to any one class member proves liability as to each member because the standardized RCL agreement forms and operating procedures provide a common basis for liability.

## Breach of Contract

{¶ 48} Similarly, Agrawal's breach of contract claim is also premised on the standard lease forms and operating procedures maintained by Ford Credit. The claim alleges that Ford Credit's procedures mandate that Ford assess contractual EWU charges to class members without performing the inspections as mandated by the lease agreement. In other words, Agrawal alleges that Ford Credit breached the written lease agreement by implementing the more stringent "clean" EWU standard during lease-end inspections when that standard is not permitted under the lease. Agrawal's breach of contract claim relies on Ford Credit's RCL dealer handbook, which instructs inspectors nationwide that "the 'inspection standard' is equivalent to a 'clean' rather than 'average' used vehicle." Ford Credit does not dispute the existence of the handbook provision or the fact that the handbook is utilized during lease-end inspections. Rather, Ford Credit contends that it did not, nor has it ever, implemented the "'clean' standard when inspecting leased vehicles." However, given the unambiguous nature of the language contained in the inspection standard provision in the RCL dealer handbook, we agree with the trial court's determination that Ford Credit's argument goes to the merits of the case and does not

affect class certification. Accordingly, we find that liability rests solely on a textual interpretation of the inner workings between Ford Credit's standard RCL forms and its standardized lease-end inspection practices and procedures. Such an inquiry resolves the issue class wide and precludes individual inquiry on a case-by-case basis.

**Ohio Subclass**

{¶ 49} As in Agrawal's CLA and breach of contract claims, Agrawal's fraud claim alleges that the RCL agreement contained misrepresentations, including the standard used for evaluating EWU and concealment of standard operating procedures for lease-end inspections. Ford Credit asserts that "Ohio cases recognize that fraud claims in particular are not suitable for class treatment because there is a need to establish individual reliance and other elements of fraud." We find appellant's assertion to be an overstatement of the law in Ohio.

{¶ 50} In *Cope*, the Ohio Supreme Court stated, "It is not necessary to establish inducement and reliance upon material omissions by direct evidence. When there is nondisclosure of a material fact, courts permit inferences or presumptions of inducement and reliance. Thus, cases involving common omissions across the entire class are generally certified as class actions, notwithstanding the need for each class member to prove these elements." *Cope* at 436. Similarly, this court stated, in *Amato v. Gen. Motors Corp.* (1982), 11 Ohio App.3d 124, 463 N.E.2d 625, "If the trial court finds misrepresentations were made to the class members, at least an inference of reliance would arise as to the entire class." Id. at 127.

{¶ 51} Unlike the circumstances described in *Young*, *Linn*, *Hoang*, and *Augustus*, this matter does not involve oral misrepresentations, nor does it involve varying misrepresentations to each individual lessee. Rather, the allegations are based entirely on the misrepresentations or omissions contained in Ford Credit's standardized RCL form signed by each class member. Therefore, the allegations are common to each potential member of the class.

**2.**

{¶ 52} Ford Credit also argues that damage assessments will be so highly individualized that they cannot be calculated on a class-wide basis. It should first be noted that, to the extent Ford Credit is correct, that does not mean that a class should not be certified; Civ.R. 23(C)(4) allows a court to grant class action status only to particular issues.

{¶ 53} With respect to Agrawal's CLA claim, Ford Credit contends that Agrawal cannot establish actual damages, as provided under TILA, without conducting individualized inquiries. Individuals may recover actual damages under §1640(a)(1), upon demonstrating reliance. "The legislative history emphasizes that TILA provides for statutory remedies on proof of a simple TILA violation, and requires the more difficult showing of detrimental reliance to prevail on a claim for actual damages." *Turner v. Beneficial Corp.* (C.A. 11, 2001), 242 F.3d 1023, 1028. "Actual damage is thus sustained as a result of a failure to disclose under the statute if a consumer can show that, had he been properly informed, he would have engaged in a different or less-expensive

transaction." *Perrone v. Gen. Motors Acceptance Corp.* (C.A.5, 2000), 232 F.3d 433, 436. Accordingly, the standard of reliance in a claim for actual damages under §1640(a)(1) is more stringent than the standard required for establishment of common law fraud in Ohio. Consequently, in most cases, actual damages are nonexistent or difficult to prove. *Turner* at 1028.

{¶ 54} Ford Credit's argument that class certification is not appropriate on the request for actual damages is supported by *Perrone*, supra. That court held, "[s]ince individual reliance is necessary to prove actual damages, a class action *may not* be certified on this issue." (Emphasis added.) Id. at 440. See, also, *Stout v. J.D. Byrider* (C.A.6, 2000), 228 F.3d 709, 718 (holding that TILA issues should not be certified for class action status when individual reliance will be at issue). While we fail to follow *Perrone*'s hard-line rule that a class action may never be certified on the issue of actual damages, in this matter we find that the trial court's acceptance of Agrawal's class-wide request for actual damages was an abuse of discretion. This determination does not alter class certification on Agrawal's request for statutory damages pursuant to 15 U.S.C. §1640(A)(2)(b).

{¶ 55} Additionally, Ford Credit argues that class certification is inappropriate for Agrawal's breach of contract and fraud allegations where he has failed to establish an injury in fact. In *Hoang*, this court explained the nature of damages as they relate to class action determinations:

**{¶ 56}** "[T]he fact of damage question is distinct from the issue of actual damages. Fact of damage pertains to the existence of injury, as a predicate to liability; actual damages involve the quantum of injury, and relate to the appropriate measure of individual relief. Although actual damages typically require the courts to become involved in individual calculations of fact of damages, this has been held to be an insufficient basis for denying class certification. * * * Class treatment of damage issues, however, presumes the ability to prove fact of damage without becoming enmeshed in individual questions of actual damage. * * * Where proof of fact of damage requires evidence concerning individual class members, the common questions of fact become subordinate to the individual issues, thereby rendering class certification problematic." Id., citing *Martino v. McDonald's Sys., Inc*. (N.D.Ill. 1980), 86 F.R.D. 145, 147.

**{¶ 57}** As discussed above, the common issues relevant to Ford Credit's liability can be established on a class-wide basis upon a merit-based examination of Ford Credit's RCL lease agreements and its utilization of standardized procedures and practices. Despite Ford Credit's argument to the contrary, we find the alleged use of a more stringent standard during lease-end inspections to be an injury standing alone. Therefore, the fact of damage can be established on a class-wide basis without becoming enmeshed in individual questions of actual damages. Additionally, the type of damages suffered by the lessees is similar in kind, if not amount. These damages are common across the

class, and the trial court could reasonably conclude that they predominated over questions concerning the amount of individual damages, although the amounts may vary.

### ii. Superiority

{¶ 58} The second prong of the Civ.R. 23(B) analysis requires the court to determine whether a class action is the superior method to fairly and efficiently adjudicate the matter. The Ohio Supreme Court has recognized that four factors listed by the drafters of Civ.R. 23(B)(3) may be of importance when addressing whether the class vehicle is superior to other methods of litigating claims: "'(a) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (b) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (c) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (d) the difficulties likely to be encountered in the management of a class action.'" *Schmidt v. Avco Corp.* (1984), 15 Ohio St.3d 310, 314, 473 N.E.2d 822.

{¶ 59} Here, "[n]o individual has attempted to institute a parallel action or to intervene in this action, and it is unlikely that any new suits will be filed given the relatively small individual recoveries and the massive duplication of time, effort, and expense that would be involved. While the class is numerically substantial, it is certainly not so large as to be unwieldy. Class action treatment would eliminate any potential danger of varying or inconsistent judgments, while providing a forum for the vindication of rights of groups of people who individually would be without effective strength to

litigate their claims." *Hamilton* at 80. Based on all these factors, class treatment is the superior method of resolving the present dispute.

{¶ 60} In light of the foregoing, we conclude that the trial court did not abuse its discretion in granting class certification, except for the inclusion of actual damages under Agrawal's CLA claim. "Indeed, we cannot imagine a case more suited for class action treatment than this one. This case involves the use of form documents, standardized practices and procedures, common omissions spelled out in written contracts, and allegations of a widespread scheme to circumvent statutory and regulatory disclosure requirements, any one of which has been held to warrant class action treatment." *Cope* at 1009. Consistent with this precedent, this court concludes that Ford Credit's systematic practices and uniform policies warrant class certification under Civ.R. 23(B)(3).

## B. Class Certification Under Civ.R. 23(B)(2)

{¶ 61} Ford Credit next argues that the trial court erred and abused its discretion by granting appellee's motion for class certification under Rule 23(B)(2). This provision states, "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole[.]"

{¶ 62} Under this provision, a plaintiff must show that the defendant's actions impact the entire class and that final injunctive or declaratory relief is appropriate. Here, appellee seeks to enjoin Ford Credit from committing the unfair and deceptive practices

alleged in his complaint. Ford Credit argues that the equitable relief sought is incidental to monetary damages.

{¶ 63} "Certification under Civ.R. 23(B)(2) depends upon what type of relief is primarily sought, so where the injunctive relief is merely incidental to the primary claim for money damages, Civ.R. 23(B)(2) certification is inappropriate." *Wilson v. Brush Wellman, Inc.*, 103 Ohio St.3d 538, 2004-Ohio-5847, 817 N.E.2d 59, ¶17, citing *Zinser v. Accufix Research Inst., Inc.* (C.A.9, 2001), 253 F.3d 1180. The Seventh Circuit, in denying certification of a class action seeking injunctive relief and money damages, has also stated that "[a]n injunction would not provide 'final' relief as required by Rule 23(B)(2). An injunction is not a final remedy if it would merely lay an evidentiary foundation for subsequent determinations of liability." *Kartman v. State Farm Mut. Auto. Ins. Co.* (C.A. 7, 2011), 634 F.3d 883, 893.

{¶ 64} In *Marks v. C.P. Chem. Co., Inc.* (1987), 31 Ohio St.3d 200, 203, 509 N.E.2d 1249, class certification was denied for individuals who had foam insulation with toxic formaldehyde levels sprayed into their homes. The plaintiffs sought future diagnostic testing for class members in addition to damages. The Ohio Supreme Court declined to certify the class under Civ.R. 23(B)(2) because the "provision is inapplicable where the primary relief requested is damages."

{¶ 65} Recently, in *Wal-Mart Stores, Inc. v. Dukes*, supra, the Supreme Court found that Rule 23(B)(2) "does not authorize class certification when each class member would be entitled to an individualized award of monetary damages." Id. at 2557. The

court went on to find that "individualized monetary claims belong in Rule 23(B)(3). The procedural protections attending the (B)(3) class — predominance, superiority, mandatory notice, and the right to opt out — are missing from (B)(2) not because the Rule considers them unnecessary, but because it considers them unnecessary to a (B)(2) class. When a class seeks an indivisible injunction benefitting all its members at once, there is no reason to undertake a case-specific inquiry into whether class issues predominate or whether class action is a superior method of adjudicating the dispute." Id. at 2558. However, the *Dukes* court did not address the specific question here — whether a class should be certified under both Civ.R. 23(B)(2) and (B)(3).

{¶ 66} In a case more analogous to the issues presented to this court, the Ohio Supreme Court stated, "[d]isputes over whether the action is primarily for injunctive or declaratory relief rather than a monetary award neither promote the disposition of the case on the merits nor represent a useful expenditure of energy. Therefore, they should be avoided. If the Rule 23(A) prerequisites have been met and injunctive or declaratory relief has been requested, the action usually should be allowed to proceed under subdivision (B)(2). * * * The court has the power under subdivision (C)(4)(a), which permits an action to be brought under Rule 23 'with respect to particular issues,' to confine the class action aspects of a case to those issues pertaining to the injunction and to allow damage issues to be tried separately." *Hamilton* at 87, 694 N.E.2d 442, quoting Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure (2 Ed.1986)

470, Section 1775.  See, also, *Asset Acceptance L.L.C. v. Caszatt*, Lake App No. 2009-L-090, 2010-Ohio-1449, ¶71.

{¶ 67} Aside from the guidance afforded by *Hamilton*, we note that the relief sought by the prospective class includes money damages that require individualized analyses as to the proper amount, but that relief "flows" from the equitable relief sought. This is the test developed by the Fifth Circuit in determining whether certification of such a class is proper.  See *Allison v. Citgo Petroleum Corp.* (C.A.5, 1998), 151 F.3d 402. That court defined incidental to mean damages that "flow directly from liability to the class as a whole on the claims forming the basis of the injunctive or declaratory relief." Id. at 415.  Therefore, whether we engage in the more rigorous analysis of whether a class should be certified under both subsections or adhere to the Ohio Supreme Court's guidance in *Hamilton* to avoid such an analysis, the result is the same.  The class is maintainable under both Civ.R. 23(B)(2) and (B)(3).

{¶ 68} Appellant's second assignment of error is overruled.

## Conclusion

{¶ 69} For the reasons stated above, we affirm the judgment of the trial court granting nationwide class certification and certification of an Ohio subclass, except that class certification of Agrawal's claim for actual damages under the CLA is reversed.

Judgment affirmed in part and reversed in part.

It is ordered that appellant and appellee share the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to said court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.


FRANK D. CELEBREZZE, JR., PRESIDING JUDGE

LARRY A. JONES, J., and
EILEEN A. GALLAGHER, J., CONCUR